IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **UNDER SEAL** |
| AL GIBRAN TAYLOR; and<br>ANTONIO CHESTER LEWIS, | Case No. 1:24-MJ-106 |
| Defendants. | |

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Cody McClinton, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Titles 18, 21, and 26 of the United States Code.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been since June 2023.  I am currently assigned to a squad that investigates violent crimes out of the FBI's Violent Crimes Task Force of the Washington, D.C. Field Office.  Previous to being appointed a Special Agent with the FBI, I was an analyst with the FBI since 2018.  Previous to working at the FBI, I was a Special Agent with the Air Force Office of Special Investigations since 2015.  During my participation in law enforcement, I have conducted or assisted with arrests, search warrants and court orders.  I have investigated and assisted in investigations involving

robberies, assaults, thefts, sexual abuse/assault, terrorism matters, and threats, which have resulted in arrests and convictions.

3.      The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge and observations during the course of this investigation, as well as the observations, training, and experience of other agents and law enforcement officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of records, documents, and other physical evidence obtained during the course of this investigation.

4.      Because this affidavit is being submitted for the limited purpose of obtaining a complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of this warrant.

5.      I make this affidavit in support of an application for a Criminal Complaint and Arrest Warrant for **AL GIBRAN TAYLOR** and **ANTONIO CHESTER LEWIS**.  For the reasons set forth below, I submit that there is probable cause to believe that TAYLOR, LEWIS, and/or other known or unknown coconspirators have committed a violation of 18 U.S.C. § 1951(a) (obstruction of interstate commerce by means of robbery), among other crimes.

## PROBABLE CAUSE

**I.    The November 18, 2023 Robbery**

6.      On November 18, 2023, at approximately 3:23 p.m., two individuals robbed a local business in Chantilly, Virginia, called the Chantilly Check Cashing and Kwik Dollar Stop (hereinafter, the **"Victim Store"**).  The robbery involved the use of what appeared to be a firearm, and it resulted in the theft of approximately $42,610.

7.      The Victim Store is located at 14017 Lee Jackson Memorial Highway Service

Road, in Chantilly, VA.  This location is in Fairfax County, within the Eastern District of Virginia. The store is one business within a larger shopping center that contains multiple other local businesses.

8.     The November 18, 2023 robbery was captured on video surveillance.  The video surveillance shows that at the time of the robbery, two men walked into the Victim Store.  The first individual (hereinafter, **"Suspect-1"**) was wearing a bright yellow jacket with reflective stripes; dark pants; a black mask covering his head and most of his face; dark sneakers; and white gloves.  He was carrying a light-colored duffle bag or backpack over one shoulder.  He was also carrying what appeared to be a firearm with a drum magazine.

9.     The second individual (hereinafter, **"Suspect-2"**) was wearing a long, loose-fitting blue garment; a black-and-white checkered headscarf; sunglasses; dark sneakers; and a dark face mask covering the bottom half of his face.  Suspect-2 was also carrying a silver plastic bag.  The bag appeared to have a logo on it, possibly, the logo of Lidl, a chain of grocery stores.

10.    Screenshots from the surveillance footage, showing Suspect-1 and Suspect-2 entering the Victim Store, are printed on the next page:

**Suspect-1**                                          **Suspect-2**

                                  

11.     Suspect-1 walked into the Victim Store brandishing what appeared to be a firearm. Suspect-2 followed him a few steps behind.

12.     Suspect-1 walked to the back restaurant area of the store, where approximately ten people were sitting.  The store's cashier was also sitting in this back area of the store.  Suspect-1 pointed the firearm at the restaurant patrons and appeared to order them to raise their hands in the air.

13.     Suspect-2, meanwhile, walked to the door of the cashier booth (which is a room within the Victim Store, that contains a cash register and safe, and the door to which can be locked). Suspect-2 attempted to enter the booth, but the door appeared to be locked.  He motioned and appeared to call out to Suspect-1.  Suspect-1 then appeared to identify the store cashier in the restaurant area, grabbed her by the neck, and brought her to the cashier booth, where Suspect-2 was waiting.

4

14.     While Suspect-2 stood nearby, the cashier unlocked the door to the cashier booth with a key she was carrying.  Suspect-2 entered the cashier booth with the cashier.  He walked to a safe, which was unlocked, took a tray of money out of it, and dumped the money into the plastic bag he was carrying.  Suspect-2 then exited the cashier booth and walked out of the store through its front door.

15.     Suspect-1, during this time, remained in the back area of the store, guarding the restaurant patrons.  After Suspect-2 exited the store through the front door, Suspect-1 left through a back door.

16.     After the suspects left the Victim Store, a store customer or employee called the police, and law enforcement responded to the scene.

17.     The Victim Store was closed for a short period of time while law enforcement investigated the scene.

18.     Officers processed the scene for fingerprint and DNA evidence.  The results of the forensic tests, at present, have not yielded any new evidence.

19.      Law enforcement later received an email from one of the store's owners, estimating that approximately $42,610 in cash had been taken during the robbery.

## II.     Review of Surveillance Footage

20.     After arriving at the robbery scene, law enforcement collected surveillance footage from the Victim Store and from a number of businesses in the shopping center where the Victim Store is located.

21.     The footage shows that a vehicle possibly associated with the robbery drove slowly past the Victim Store the morning of the robbery.  It also shows Suspect-1 observing or scoping out the Victim Store, and Suspect-2 also in the vicinity of the Victim Store, in the time before the robbery occurred.

22.   More specifically, portions of the surveillance footage show the following:

a.   At approximately 10:44 a.m. on the day of the robbery, November 18, 2023, a white Lexus sedan whose license plate was visible in the surveillance footage (hereinafter, the **"Robbery Vehicle"**) slowly drove through the parking lot adjacent to the Victim Store, possibly making an observation of the store.  The Robbery Vehicle appeared to have darkly tinted windows and dark black/grey wheels. A still image that an officer captured from nearby surveillance footage showed what appeared to be some type of yellow reflective clothing through the front windshield, possibly sitting in the back seat of the vehicle, as it drove by:

**Surveillance Image of the Robbery Vehicle
(License Plate Redacted)**



b.   At approximately 12:59 p.m., Suspect-1 appeared in the footage, outside of a local business.  This business is approximately 200 feet away from the Victim Store. Suspect-1 waited outside of this business for approximately ten minutes.  He was, during this time, wearing the same distinctive yellow jacket, wearing the same

sneakers and face mask, and carrying the same duffel bag or backpack, as he wore during the robbery.

c.   At approximately 1:10 p.m., Suspect-1 walked away from this location, heading west toward a nearby road, called Sullyfield Circle.   Approximately one minute later, at 1:11 p.m., a car matching the description of the Robbery Vehicle drove toward a person matching the description of Suspect-1, slowed down, and appeared to stop behind a row of bushes.   The person matching the description of Suspect-1 walked behind the row of bushes, and the car remained there for approximately 20 seconds.   The car then continued driving, heading north, away from the shopping center.   The car appeared to pick Suspect-1 up.[1]

d.   At around 1:16 p.m., a person entered the Victim Store and purchased a soft drink (hereinafter, the "Soft Drink Suspect").   This person was wearing the same sneakers and similar-looking pants as Suspect-1 later wore during the robbery (but without the yellow jacket or the bag).   He also had the same approximate height and weight as Suspect-1, and his walk and gait appeared similar to that of Suspect-1. Screenshots comparing Suspect-1 with this person are printed on the next page:

---

[1] The surveillance footage of these moments was captured on cameras outside of two local businesses.   Some of this footage shows the person matching the description of Suspect-1 and the white vehicle only at a lengthy distance.   The license plate of the vehicle is not visible in this footage.   The vehicle, however, has the same color, dark window tint, and dark wheels as the Robbery Vehicle.   The shape and appearance of taillights on the vehicle in the footage also match the taillights of the Robbery Vehicle.

As for Suspect-1, although the footage also captures him only at a lengthy distance, his distinctive yellow jacket stands out, making him likely identifiable as Suspect-1.   This person's act of walking toward the vehicle at this moment, 1:11 p.m., also coincides with Suspect-1's walking away from a local business, in footage that more clearly shows his appearance, the minute prior, at 1:10 p.m.

**Screenshots Comparing Suspect-1 with the Soft Drink Suspect**



e.  In addition, at one point in the surveillance footage, Suspect-1 lifted his arms above his head, exposing a dark shirt with a blue stripe that appeared to be underneath his yellow jacket.  This color and appearance of this stripe matches one that the Soft Drink Suspect had on his shirt.  Screenshots of the surveillance footage comparing the two individuals are printed on the next page:

**Additional Screenshots Comparing Suspect-1 with the Soft Drink Suspect**






f.  The Soft Drink Suspect walked into the Victim Store and appeared to say something to the cashier.  He then walked to the back of the store, likely, into the store's bathroom.  A few moments later, the Soft Drink Suspect exited the bathroom and returned to the front of the store.  He stopped at a cooler containing soft drinks, took out a drink, and brought the drink to the cashier booth.  He took out his wallet, paid for the drink in cash, and left the store.

g.  At approximately 3:10 p.m., Suspect-1 appeared in surveillance footage, which agents obtained from a nearby branch of a bank.  The footage shows Suspect-1 walking east across Sullyfield Circle toward the direction of the shopping center where the Victim Store is.

h.  At around 3:13 p.m., Suspect-2 appeared in the surveillance footage, standing next to a group of garbage dumpsters behind a local business, approximately 200 to 250 feet from the Victim Store.  Suspect-2 was, during this time, wearing the same clothes as he wore during the robbery:  a long, loose-fitting blue garment; a black-and-white checkered headscarf; sunglasses; dark sneakers; and a black face mask. He was also carrying the same silver plastic bag as during the robbery.

i.  Two minutes later, at around 3:15 p.m., Suspect-2 walked away from this location. He crossed through the shopping center's parking lot, walking in the direction of the Victim Store.  Though the surveillance shows Suspect-2 only at a distance, it appears to show him holding his arm and hand up to his ear in a manner consistent with someone speaking on a phone call.

j.  A few minutes later, at approximately 3:21 p.m., Suspect-2 met up with Suspect-1 at a point near the shopping center's parking lot.  Suspect-1 was, during this time,

wearing the same clothes and carrying the same bag as during the robbery.  Suspect-1 and Suspect-2 walked, one in front of the other, through the shopping center and past the Victim Store.  They stopped in front of a restaurant near the Victim Store.

k.   Approximately two minutes later, at around 3:23 p.m., the two suspects entered the Victim Store and committed the robbery.

l.   Following the robbery, at approximately 3:24 p.m., the two suspects fled the Victim Store, with Suspect-1 exiting through the store's rear door and Suspect-2 exiting through the front door.

m.   After the robbery, at approximately, 3:25 p.m., Suspect-2 crossed the parking lot of the nearby bank.  Suspect-2 then crossed Sullyfield Circle, in the same direction that Suspect-1 was seen originating from during earlier footage (at approximately 3:10 p.m.).

n.    Approximately 45 seconds later, at approximately 3:25:45 p.m., Suspect-1 crossed the bank parking lot, in the same approximate direction as Suspect-2.  Suspect-1 then also crossed Sullyfield Circle.

23.   Based on their similarities in appearance and the other information recited in this Affidavit, both above and below, there is probable cause to believe that the Soft Drink Suspect and Suspect-1 were the same person.

### III.   Identification of Suspect-1 and Suspect-2

24.   Following the robbery, agents and law enforcement officers took certain investigative steps to determine the identities of the robbery suspects.  Agents believe that there is probable cause that both the Soft Drink Suspect and Suspect-1 are **LEWIS**, and that there is probable cause that Suspect-2 is **TAYLOR**.  Certain of the investigative steps that agents and officers took are described below.

A.    **Identification of the Soft Drink Suspect and Suspect-1**

25.    Agents analyzed the footage of the Soft Drink Suspect.  They obtained and reviewed a prior booking photograph for LEWIS, associated with his processing into a regional jail in 2007.  Though the photograph dates from 2007 or earlier, it matches the appearance of the Soft Drink Suspect.  Agents also obtained a DMV photograph of Lewis, which also seems to match the appearance of the Soft Drink Suspect.  The booking photograph, DMV photograph, and screenshots of the surveillance footage of the Soft Drink Suspect are printed below:

**Photographs of LEWIS and Surveillance Footage of the Soft Drink Suspect**

 

 

26.    After identifying LEWIS as a possible suspect, agents conducted in-person visual surveillance on him.  They took photographs of him during this time.  The photographs also show that LEWIS appears to match the appearance of the Soft Drink Suspect.  In one photograph, furthermore, LEWIS appeared to be wearing the same or a similar hat as the one that the Soft Drink Suspect was wearing.  A copy of this photograph is printed on the next page:

13

**Photograph of LEWIS from In-Person Visual Surveillance**



27.     Agents conducted a search through law enforcement databases and learned that LEWIS had been questioned by the Arlington County Police Department in March 2023, as part of an alleged assault incident.   The police report for this incident indicates that LEWIS was working installing commercial office furniture at the time.   Officers obtained the body worn camera ("BWC") footage associated with this incident.

28.     The BWC footage shows LEWIS wearing a bright yellow vest with reflective stripes.   Screenshots from the BWC footage associated with this incident are printed on the next page:

14

**Screenshots of LEWIS, from Arlington County Police Department BWC, in March 2023**

 

29.     The vest observed in the BWC footage and the jacket that Suspect-1 wore during the robbery are not exactly the same, as one was a vest, and the other was a jacket with full-length sleeves.  The reflective pattern on the two items is similar, however, and the fact that LEWIS was in a construction-related job could mean that he had easy access to jackets such as the one that Suspect-1 was wearing during the robbery.

30.     As shown in the above-right picture, LEWIS can also be seen, in the BWC associated with the March 2023 incident, pulling out a trifold wallet from his rear pocket.  In the surveillance footage from the day of the robbery, the Soft Drink Suspect also pulled out a trifold wallet from the same rear pocket location when paying for his soft drink at the Victim Store.  The wallet seen in the March 2023 BWC is similar in appearance to the one that the Soft Drink Suspect used.

31.     LEWIS was also the subject of a different police report in July 2023, filed in

Montgomery County, Maryland.  In this report, a former spouse or intimate partner of LEWIS alleged that LEWIS had stolen two riles from her, a Core 15 Scout Rifle and a Black Aces Tactical Pro Series M Shotgun.  Being a modular weapon, the allegedly stolen Scout rifle could be similar in appearance (or could have been modified to be similar in appearance) to the suspected firearm that Suspect-1 was observed carrying during the robbery.

32.     Through searches of law enforcement databases, agents learned that a certain telephone number, hereinafter, the "**LEWIS NUMBER**", was a telephone number that was associated with LEWIS in certain reports relating to the July 2023 police activity.  When LEWIS surrendered himself to the Montgomery County Police for an outstanding arrest warrant on August 29, 2023, he provided the LEWIS NUMBER as his contact number.

33.     Through open-source searches, I have also identified social media accounts associated with LEWIS.  Using legal process, I obtained subscriber data and other information for a Facebook account belonging to LEWIS.  The subscriber data indicated that the LEWIS NUMBER was a verified phone number for the Facebook account.

34.     Through legal process, I also obtained call detail records for the LEWIS NUMBER. Between October and early November 2023, the records show that calls between the LEWIS NUMBER and a telephone number associated with TAYLOR (hereinafter, the "**FIRST TAYLOR NUMBER**", described further below) took place only occasionally, limited in some instances to just one call per day or per week.  Between October 6 and November 16, 2023, specifically, the two numbers exchanged under 20 calls.  Beginning November 17, 2023, however, the day before the robbery, the LEWIS NUMBER and the FIRST TAYLOR NUMBER exchanged many more calls.  On November 18, 2023 alone, the two numbers exchanged more than 20 calls.

35.     Some of the calls that the LEWIS NUMBER and the FIRST TAYLOR NUMBER

16

exchanged on the day of the robbery coincide with events observed in the surveillance footage. At 12:31 p.m. on November 18, 2023, the two numbers had a call for approximately 39 minutes. This call would have included the time period when Suspect-1 was observed alone in the surveillance footage at approximately 12:59 p.m., when he was standing at one of the businesses near the Victim Store. The call would then have ended at 1:10 p.m. (*i.e.*, 39 minutes after 12:31 pm.). This time, 1:10 p.m., is the time that Suspect-1 began walking away from the nearby business and toward a white car, which then appeared to pick him up.

36.     The records also show that the LEWIS NUMBER and the FIRST TAYLOR NUMBER continued exchanging calls on November 18, 2023 at 1:20 p.m. and then a few times between 3:06 p.m. and 3:16 p.m.

37.     At approximately 3:16 p.m. on November 18, 2023, the LEWIS NUMBER and the FIRST TAYLOR NUMBER began a call that lasted approximately 4 minutes. This call would have taken place during the time that the surveillance footage showed Suspect-2 crossing the parking lot in front of the Victim Store, when Suspect-2 appeared to be holding a cell phone to his ear. This call would have ended at approximately 3:20 or 3:21 p.m. (*i.e.*, 4 minutes after 3:16 p.m.). This time, 3:21 p.m., was the time that Suspect-1 met up with Suspect-2 in the shopping center, approximately two minutes before they robbed the Victim Store.

38.     The records show that the LEWIS NUMBER and the FIRST TAYLOR NUMBER did not exchange another call until after the robbery, at 4:38 p.m. on November 18, 2023. In the days and weeks following, the LEWIS NUMBER then exchanged occasional calls with a different number associated with TAYLOR (hereinafter referred to as the "**SECOND TAYLOR NUMBER**", and described further below).

39.     The records also show that the LEWIS NUMBER and the FIRST TAYLOR

NUMBER exchanged multiple text messages on November 17 and 18, 2023, both before and after the robbery.  They also, at times, exchanged text messages throughout October and early November 2023.

40.    I have reviewed records associated with LEWIS's criminal history.  The records indicate that in October 2005, LEWIS was convicted in the United States District Court for the Eastern District of Virginia of conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 846.  *See* Case No. 3:05-cr-00107-JAG.  He had also been convicted of other felonies prior to this date.

41.    Based on this information, I believe that LEWIS was prohibited from possessing a firearm at the time of the robbery of the Victim Store.

42.    LEWIS's criminal history documents and the above-referenced police reports also indicate that LEWIS is approximately the same height and weight as both the Soft Drink Suspect and Suspect-1 appeared to be.

43.    Based on this information, and the other information recited in this affidavit, there is probable cause to believe that LEWIS is both the Soft Drink Suspect and Suspect-1.[2]

**B.    Identification of Suspect-2**

44.    Following the robbery, agents also conducted an investigation into the identity of Suspect-2.

45.    As discussed above, the surveillance footage showed the license plate of the Robbery Vehicle, as it passed by the Victim Store at approximately 10:44 a.m. on the day of the

---

[2] Agents initially believed that a brother of TAYLOR could have been Suspect-1, based in part on a familial connection between the brother and TAYLOR that was listed on a social media account.  Agents conducted visual surveillance on the brother, however, and observed that his appearance did not match that of Suspect-1 or of the Soft Drink Suspect.

robbery.  Officers ran a check for this license plate and determined that it was associated with a 2015 white Lexus GS-350 vehicle, registered to a person residing in Virginia.

46.     Through reviews of public records, law enforcement databases, and social media, agents determined that this person (the registered owner of the Robbery Vehicle) is a sister of TAYLOR.  Through open-source searches, agents found and reviewed several social media accounts associated with TAYLOR.

47.     At one point in the surveillance footage on the day of the robbery, Suspect-2 appeared to walk through the shopping center with his mask pulled down to his chin, providing the camera with a partial view of his face.  Agents compared this surveillance footage to photos of TAYLOR that they obtained from his social media accounts.  The pictures of TAYLOR from social media match the appearance of Suspect-2 in this footage.  The photos from TAYLOR's social media are printed on the next page, together with screenshots of the surveillance showing a portion of Suspect-2's face:

**Photos of TAYLOR from Social Media and Screenshots of Surveillance Footage**

 

 

48.     TAYLOR's social media accounts also feature photos and videos of him wearing sunglasses, which appear to be the same as or similar to those that Suspect-2 wore during the robbery.  Screenshots from these social media photos and videos are printed on the next page, together with screenshots of the robbery surveillance footage:

**Photos / Screenshots of TAYLOR from Social Media and Screenshots of Surveillance Footage**







49.     Another photo from TAYLOR's social media, dated June 9, 2019, shows him wearing what appears to be a black-and-white checkered headscarf that is the same as or similar to the one that Suspect-2 wore in the robbery.  This photo is printed on the next page:

**Photo of TAYLOR from Social Media**



50.     Agents also reviewed a video of TAYLOR on one of his social media accounts, which shows him wearing a garment similar to, or possibly the same as, the long blue gown that Suspect-2 wore during the robbery.  A screenshot of this video is printed below:

**Screenshot of Video from Social Media**



51.     Through a review of law enforcement databases, agents determined that the sister of TAYLOR who was the registered owner of the Robbery Vehicle likely lived with TAYLOR in

22

the same residence as him.   This residence was in Herndon, Virginia.   The building is an approximate 12-minute drive from the Victim Store.

52.   Agents conducted visual surveillance on this building.  They observed TAYLOR entering and leaving the building.   Agents also confirmed with building management that TAYLOR lived there.  They reviewed lease contracts for the apartment unit, which showed both TAYLOR and his sister as the unit's occupants.

53.   Agents observed the Robbery Vehicle parked in the garage of this apartment building.  They observed TAYLOR enter and drive the Robbery Vehicle in at least one instance.

54.   Agents reviewed documents about TAYLOR and his sister from building management, which the agents obtained through legal process.  The documents showed that the Robbery Vehicle was registered with building management as a car that belonged to TAYLOR's sister.  The documents also showed that the Robbery Vehicle was assigned a parking space in the building's garage.

55.   Agents reviewed logs of the building key fobs assigned to TAYLOR and TAYLOR's sister.  Key fobs are devices that can be used to open doors equipped with electronic locks.  The logs show that fobs assigned to TAYLOR and his sister were used to open doors in the apartment building throughout the day of the robbery.

56.   The logs show that almost immediately after the robbery, at 3:41 p.m. on November 18, 2023, a fob assigned to TAYLOR was used to open the building's overhead garage door.  A few minutes later, at 3:44 p.m., another fob assigned to TAYLOR was used to open a door at the stairwell on the floor of TAYLOR's apartment.  This indicates that TAYLOR likely entered his apartment very shortly after the robbery concluded.

57.   Agents reviewed copies of correspondence between building management and

TAYLOR and his sister, which building management provided to the agents. In emails dated February 2023, TAYLOR's sister asked building management to add telephone numbers for TAYLOR to the building's exterior call box. One of these numbers was the FIRST TAYLOR NUMBER.[3]

58.     Through legal process, agents obtained call detail records for the FIRST TAYLOR NUMBER. The records show the same or similar calls and text messages to and from the LEWIS NUMBER on the day of robbery as the call detail records for the LEWIS NUMBER show (described above). The call detail records for the FIRST TAYLOR NUMBER also show multiple other calls, text messages, and data usages on the day of the robbery.

59.     Through legal process, agents have also obtained subscriber data and other information for an Apple account associated with TAYLOR.[4] This subscriber data lists the FIRST TAYLOR NUMBER as one of the account's verified numbers. Apple's subscriber records also indicate that one of the devices associated with the FIRST TAYLOR NUMBER is an Apple iPhone with the same International Mobile Equipment Identity ("IMEI") number and International Mobile Subscriber Identity ("IMSI") number as those that are associated with the FIRST TAYLOR NUMBER in records that I obtained from the FIRST TAYLOR NUMBER's wireless provider.

---

[3] TAYLOR's sister also asked building management to list two other numbers for TAYLOR for the building's call box. She provided management with one of these numbers in December 2020. She provided the second number in February and April 2023. Through legal process, agents obtained call detail records for these two numbers. The records show that these numbers were not in active use around the time of the robbery, as they show very few (if any) outgoing calls or text messages from the numbers throughout November 2023.

[4] Agents believe this Apple account is associated with TAYLOR because, among other reasons: (a) the Apple ID associated with the account is an email address that TAYLOR used at one point to correspond with his former apartment building's management; (b) the name associated with the Apple account is "Al Taylor," and (c) one of the addresses associated with the account is the location of TAYLOR's former apartment building.

60.    On or about December 7, 2023, agents conducted visual surveillance on TAYLOR. Agents observed TAYLOR enter a restaurant located at in Sterling, VA, to pick up an order of food.  After TAYLOR left the restaurant, agents continued surveillance on TAYLOR as he went back to his residence.  I then went to the restaurant, where the restaurant staff provided me with a copy of TAYLOR's order receipt and the telephone number that the restaurant staff stated TAYLOR used to call his order into the restaurant.  The number that the restaurant provided me was the SECOND TAYLOR NUMBER.

61.    Through legal process, I obtained call detail records for the SECOND TAYLOR NUMBER.  The records indicate that the number became active on November 19, 2023, just one day after the robbery of the Victim Store.  The records also show multiple calls between this number and the LEWIS NUMBER after November 19, 2023.

62.    TAYLOR and his sister moved out of their apartment in December 2023.  Through surveillance and other means, agents have identified TAYLOR's likely new residence.

63.    Agents have reviewed criminal history records associated with TAYLOR.  Among other felonies, TAYLOR was convicted in June 2006, in the United States District Court for the Eastern District of Virginia, of unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g). *See* Case No. 1:06-CR-7-TSE.  He was also convicted in the same Court, in December 2006, of possession of a firearm during and in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).  *See* Case No. 1:06-CR-430-TSE.

64.    Based on all of this information, there is probable cause to believe that TAYLOR is Suspect-2.

## **CONCLUSION**

65.     Based on the foregoing, there is probable cause to believe that on or around November 18, 2023, in Fairfax County, Virginia, within the Eastern District of Virginia, AL GIBRAN TAYLOR and ANTONIO CHESTER LEWIS did commit a violation of 18 U.S.C. § 1951(a) (obstruction of interstate commerce by means of robbery).

Respectfully submitted,

CODY.
MCCLINTON

Digitally signed by CODY.
MCCLINTON
Date: 2024.03.18 15:44:52 -04'00'

Cody McClinton
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me by telephone in accordance
With Fed. R. Crim. P. 4.1 on March 19, 2024

The Honorable William B. Porter
United States Magistrate Judge
Alexandria, Virginia

26